HARRIMAN, Administratrix, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*October 25, 1911—January 9, 1912.*

*Railroads: Negligence: Duty to guard trestles, bridges, etc.: Elevated approach to ore dock: Fences and lights: Death of employee by fall: Liability: Questions for jury.*

1. While it is the duty of a railway company to use all reasonable skill to lessen the necessary dangers of operation, it is not its duty to guard its elevated trestles, bridges, or other portions of the roadbed where there may be a steep declivity on one or both sides.

2. Defendant's ore dock in Lake Superior was 68 feet above the water, 50 feet wide, and contained six railway tracks. It was connected with the shore by an approach 900 feet long and 24 feet wide containing two tracks and several switches. Beginning about 250 feet away the approach gradually widened to 50 feet as it neared the dock, and the number of tracks increased to six. The entire surface of the approach was planked, and where switches were located it was widened six feet and its edges guarded by fences. There were also fences on the edges of the dock and on each edge of the approach to a distance of more than 250 feet shoreward from the dock. Where there were no fences there were heavy guard rails or timbers at the edges extending about a foot above the surface. The sole purpose of the approach was to enable trains to reach the dock, and switches were placed thereon so that trains could pass from one track to another, and not for the purpose of making up trains or switching cars. Workmen on the dock used the approach in going to and from their work, but aside

from throwing switches no work whatever was required or permitted to be done on the approach. *Held*, that the unfenced portions of the approach were nothing more than the roadbed of the tracks for the passage of trains, and, being reasonably safe for that purpose, including all work the trainmen might reasonably be required to do in connection with the operation of trains, defendant had performed its duty towards its employees and was not bound to fence such portions.

3. In an action for death of an engineer who, in the nighttime, after stopping his engine on the approach about where the fence ended and alighting therefrom, was in some way precipitated from the approach and killed, it is *held*, as matter of law, that defendant was not negligent in failing to fence the unfenced portions of the approach or in failing to light it.

WINSLOW, C. J., and SIEBECKER and BARNES, JJ., dissent.

APPEAL from a judgment of the circuit court for Marathon county: CHAS. M. WEBB, Judge. *Reversed.*

On October 21, 1909, plaintiff's intestate was employed by the defendant company, at Ashland, as a locomotive engineer, running an engine over the approach to its ore dock, which extends out into Chequamegon Bay in a northerly direction. In the course of such employment he stopped his engine, alighted therefrom, and, in some manner undisclosed by the evidence, was precipitated into the water beneath, a distance of about sixty-eight feet, and lost his life. Plaintiff, as administratrix of the estate of her husband, brought this action to recover damages, alleging that the defendant was negligent in that it failed to fence and sufficiently light the approach. The answer denied that the defendant was negligent and alleged contributory negligence on the part of the deceased.

The dock is about 1,600 feet long and 50 feet wide. The south end thereof joins with the shore by an approach, which is about 900 feet long, 24 feet wide at its southern extremity, and when within about 250 feet of the dock it gradually widens so that as it joins the southerly end thereof it is of the same width and of the same height as the dock itself. The entire surface of this approach is planked. Upon it and the

dock are the tracks and switches of the defendant company, there being two tracks on the approach and six tracks on the dock. The edges of the dock, through its whole length, on both sides, were fenced or railed. The edges of the approach, on both the east and west sides thereof, wherever switches were located and switch work needed to be carried on, were widened six feet and guarded by railings varying in height from three to six feet, to protect the switchmen from possible danger while engaged in their duties of turning switches. Save where these switches were located, and save for a distance of 254 feet south from the dock, on the west side, and a distance of 274 feet south therefrom on the east side, both sides of the approach were unfenced. Along the extreme edges all the way on both sides of the approach where there were no fences, there were heavy guard rails or 12 x 12 timbers, extending about a foot above the surface of the approach. The distance from the west rail of the west track of the approach to the west edge of the guard rail was about three feet; and when the west track was occupied by an engine, the space between the west side of the engine and the west edge of the guard rail was only about a foot.

At about 7 o'clock in the evening of said 21st day of October the deceased, who was employed on the night shift, accompanied by the fireman, switch foreman, and switchman, started out from the roundhouse with his engine and proceeded north on the west track of the approach. When the engine reached a point on the west track of said approach within about 250 feet of the dock it was brought to a stop and the switch foreman got off. The point at which the front end of the engine stopped was about six feet south of the switch on the west track. That side of the approach was fenced or guarded from the dock to a point about twelve feet south of the switch and on the east side to a point about twenty feet further south and about twelve feet south of a switch located on that side. Where the fences ended the approach narrowed

about six feet, and that space was guarded by a fence running at right angles to the one guarding the edges of the approach. While the engine was standing still the deceased took a torch, monkey wrench, and oil can and stepped off on the east side. The fireman saw the light of his torch reflected through the cab window as he passed toward the front end of the engine. A short time after he had left the engine the fireman backed it up towards the south about six or eight feet. The deceased was last seen alive when he left the engine with the torch and tools. About half an hour afterwards there was a search made for him, and his dead body was found by the fireman from twenty-five to thirty feet south of the south end of the west fence and from fifteen to twenty feet west of the approach, in from three to six feet of water. The point where the brains of deceased were found on the approach was about eleven feet south of the south end of the west fence. The approach flared out at the bottom, and evidences of blood and brains were found at a height of two feet above the water, at a height of about five feet above the water, and at a height of about ten feet above the water, on an iron pipe along the framework on the west side of the approach, and that was the highest point. The tools and torch were not found.

The dock as well as a part of the approach close to the dock was lighted by electric arc lights, and the nearest arc light from the place of the accident was about 250 feet away. There were also lights on the head and rear ends of the engine.

The jury, by special verdict, found (1) that the defendant railway company, in failing to erect a railing on the westerly side of the approach to dock No. 1, at the point where the accident occurred, was guilty of negligence directly contributing to the injury of Engineer Harriman; (2) that the defendant railway company, in failing to maintain lights upon the approach to dock No. 1, was guilty of negligence directly contributing to the injury of Engineer Harriman; (3) that Engineer Harriman was guilty of negligence which directly

contributed to his said injury; (4) that the negligence of said Engineer Harriman was slighter as a contributing cause to said injury than that of the said railway company; and (5) damages in the sum of $7,000.

Defendant's motions, first for a nonsuit and later for direction of verdict in its favor, were denied by the court, and judgment was entered for plaintiff upon the special verdict, from which the defendant appealed.

*William G. Wheeler,* for the appellant.

For the respondent there were briefs by *Sanborn, Lamoreux & Pray,* and oral argument by *F. B. Lamoreux.*

The following opinion was filed November 14, 1911:

VINJE, J.　The jury found that the defendant was negligent in failing to fence and light the approach at the place of the accident.　No other negligence on its part was found, hence if the finding is not sustained by the evidence the judgment must be reversed.　The defendant owned and operated an ore dock in Chequamegon Bay at Ashland, about 1,600 feet in length, the south end of which was about 900 feet and the north end about 2,500 feet from the shore.　Its surface was 68 feet above the water and was connected with the shore by an elevated approach about 900 feet in length, containing two tracks, and in several places some switches so that trains might be run from one track to another.　The dock was fifty feet in width and the approach twenty-four, but as it neared the dock it widened and the number of tracks on it increased to six—the number on the dock.　The surface of the approach was planked throughout, and its edges were widened six feet and guarded by a fence where switches were located. They were also guarded on the west side for a distance of 254 feet south of the dock or within twelve feet south of a switch on that side; and on the east side for a distance of 274 feet south of the dock, or within twelve feet south of a switch on that side.　The accident occurred on the west side at a point

about thirty-one feet south of the switch mentioned, or about eleven feet south of where the west fence ended.

It appears that on the evening in question the deceased was ordered to go to the dock and take some cars back to the yard as soon as they were unloaded. He procured his engine at the roundhouse, and together with the fireman, switchman, and switch foreman proceeded north on the west track of the approach. When the front end of his engine reached a point from four to six feet north of where the fence on the west side ended, or about six feet south of the switch nearest the dock on the west side, in response to a signal given by the fireman he brought it to a stop. The switch foreman went out on the dock to ascertain what cars were to be returned to the yard, and the deceased lit his pipe, took a monkey wrench, an oil can, and a torch and stepped off on the east side of the engine. The fireman saw the light of his torch reflected through the cab window as he proceeded forward. No one saw him alive after that. About half an hour afterwards search was made for him, and his dead body was found in the water about twenty-five to thirty feet south of the south end of the west fence and about fifteen to twenty feet west of the approach. Blood and brains were found on the approach at about eleven feet south of the end of the west fence. It is conjectured that he walked forward on the east side of the engine, passed in front of it, and came back on the west side, a distance of from fifteen to seventeen feet, and then fell off, or that he stumbled against the end of the 12 x 12 guard rail that began where the fence ended, pitched forward, and struck the approach fifty-eight feet down at a horizontal distance of eleven feet from where he stumbled. No one knows from just what place he fell nor what caused his fall. The side of the engine came within about thirteen inches of where the west guard fence ends and within about twelve inches of the extreme west edge of the 12 x 12 guard rail. The deceased was perfectly familiar with the construction of the dock and approach; had

worked thereon for a period of about a month and a half; and had cautioned his fireman not to work outside of the engine or stand in the gangway on the west side, as there was no barrier or fence.

It appears from the evidence that, aside from throwing switches when trains were run from one track to another, no work whatsoever was required or permitted to be done upon the approach. Deceased, as well as other engineers of defendant, had been instructed not to leave his engine while upon the approach nor to permit his engine to stand thereon. It is true, workmen on the dock used the approach more or less in going to and from their work, but it was twenty-four feet wide, planked throughout its entire width, and, where there were no fences, had the 12 x 12 timber on the sides, thus clearly marking the edges and furnishing at least a guard sufficient to prevent slipping off.

There being practically no dispute in the evidence as to the construction or use of the approach, and no reasonable room for conflicting inferences to be drawn therefrom, the question as to whether or not it was the duty of the defendant to guard its edges by a fence becomes one of law rather than one of fact. It is not a case where the jury have found negligence upon conflicting evidence. When it is borne in mind that the sole purpose of the approach was to move trains over it so that they might reach defendant's ore dock, and that the switches were placed thereon to enable a train to pass from one track to another, and not for the purpose of making up trains or switching cars, it becomes evident that the question whether or not it should be fenced is almost identical with the question whether or not it is the duty of a railroad company to guard its elevated trestles, bridges, or other portions of the track where there may be a steep declivity on one or both sides. We think no such duty devolves upon it. And we reach such conclusion mindful of the rule that it is the duty of railroads to use all reasonable skill to lessen the necessary

dangers of operation. *Dorsey v. Phillips & C. C. Co.* 42 Wis. 583. To hold otherwise would be equivalent to holding that the track of a railroad must at all points be safe for an engineer to stop his engine and repair it. Such a rule would place an unreasonable burden upon railroads without any necessity for it. The unfenced portions of the approach were nothing more than the roadbed of the track for the passage of trains. And if they were reasonably safe for such purpose, including all work that the crew of a train may reasonably be required to do in connection with the operation of a train over the track, then defendant had performed its duty towards its employees. It is not necessary that every portion of the track should be a fit repair shop. Railroads must needs pass over all sorts of places and reach all kinds of industries, and its tracks cannot always and at all points be in a safe condition for its employees to walk around a train or engine standing thereon. The ore dock had to be constructed far out in the bay. It had to be high so that gravity would load the vessels. Trains had to reach it, and the approach was built to enable them to do so. We perceive no reason why such a portion of a track of a railroad should be guarded any more than other portions, such as trestles, bridges, or steep declivities equally dangerous for repair work. There is not a syllable of evidence to show that the fences placed thereon were not adequate to protect trainmen in switching trains from one track to another or that there was any danger to employees in walking over a planked surface twenty-four feet wide without more of a guard than that furnished by the 12 x 12 timbers.

In this case, by moving his engine a few feet further toward the dock, the deceased would have had a perfectly safe place in which to make any needed repairs. Whether repairs were needed no one knows. Presumably the deceased thought they were, else he would not have taken the tools he did and stepped off the engine.

Having reached the conclusion that the approach required

no guard because it was practically nothing more than a portion of elevated tracks for the passage of trains, it follows that no duty devolved upon the defendant to light it. The court should have granted defendant's motion for nonsuit, and, failing in that, it should have directed a verdict in its favor.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for defendant.

The following opinion was filed November 17, 1911:

WINSLOW, C. J. (*dissenting*). I find myself unable to agree with the conclusion reached by my brethren in this case. I think the judgment should be affirmed. The so-called approach to the ore dock was essentially a part of the dock itself; at least it seems to me that it was very different in character from an ordinary bridge or viaduct. It was carefully planked for its entire length; it was universally used by employees in going to and from their work on the dock; engines and trains frequently stopped on the approach in the course of their work and were compelled to do so; employees were unquestionably compelled to frequently get down from engines or cars and walk upon it in the course of their duties. These considerations apply to the entire approach; but as to that part of the approach from which the deceased fell, a still more persuasive circumstance, which does not apply to the whole approach, is to be considered. The point where the deceased doubtless stumbled and fell from the approach, because of the lack of a guard rail, was just twelve feet from the point of a switch and from the switch stand connected therewith. At this switch another track diverged from the track on which the engine in question was standing, and formed one of the four tracks used on the dock. Necessarily this switch must have been much used, and brakemen and switchmen would naturally be obliged to get down from cars

and engines and walk about while performing their duties in the immediate neighborhood of this switch stand.     Whether there should not have been a guard rail for a greater distance than twelve feet from this switch stand toward the shore seems to me clearly a question for the jury, and the jury's verdict to that effect is, in my judgment, supported by sufficient evidence.

I think also that there was sufficient ground for the jury's conclusion that the negligence of the defendant was greater than that of the deceased, and hence I think the judgment should be affirmed.

I am authorized to state that Justices SIEBECKER and BARNES concur in this dissenting opinion.

A motion for a rehearing was denied January 9, 1912.